# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

THE FOLLOWING PROPERTY:

**APPLICATION & AFFIDAVIT
FOR SEARCH WARRANT**
**Case Number:** 07 - M - 418

**4673 N. 67th St., Milwaukee, WI-a one story, single family residence, with orange colored brick, green trim, and the numbers "4673" affixed to the east side of the house east of the front door;**

I, MARK BANKS, being first duly sworn depose and state:

I am a federally deputized Task Force Agent of the United States Department of Justice, Drug Enforcement Administration and have reason to believe that on the property or premises known as:

**4673 N. 67th St., Milwaukee, WI-a one story, single family residence, with orange colored brick, green trim, and the numbers "4673" affixed to the east side of the house east of the front door;**

in the E.D. of Wisconsin there is now concealed certain property, namely: SEE ATTACHMENT A

which is evidence of the commission of crimes, concerning violations of <u>Title 21, U.S.C., Section 846</u>.

### The facts to support a finding of probable cause are stated on attached affidavit.

Continued on the attached sheet and made a part hereof.      **✗** Yes      No

Sworn to before me, and subscribed in my presence:

_Signature of Affiant:_ **MARK BANKS**

<u>January 18, 2007</u> at 5:25 PM      at
Date and time issued

<u>Milwaukee, Wisconsin</u>
City and State

HONORABLE WILLIAM E. CALLAHAN, JR.
<u>United States Magistrate Judge</u>
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT FOR SEARCH WARRANTS

I, Mark Banks, being first duly sworn on oath depose and say that upon personal knowledge and upon information and belief:

## I.    AGENT EXPERTISE AND KNOWLEDGE

1.    I am a Special Agent employed by the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) and have been so employed since April 1990. I am currently assigned to the Milwaukee Field Office. In September 2005, I was deputized as a federal Task Force Agent with the United States Department of Justice, Drug Enforcement Administration (DEA). I have had both formal training and participated in numerous complex narcotics trafficking investigations, including ones using court-authorized wiretaps. Based on my training, experience, and participation in drug trafficking investigations and associated financial investigations involving large amounts of cocaine, cocaine base[1] (crack cocaine), marijuana, and/or other controlled substances, I know and have observed the following:

A.    I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

B.    I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances myself;

C.    I have extensive experience conducting street surveillance of individuals engaged in drug trafficking activities. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

---

1. Throughout this affidavit, if "crack" or "crack cocaine" is referenced, I mean cocaine base in the form of crack cocaine.

1

D.  I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

E.  I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

F.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms and ammunition, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons, as well as records or receipts pertaining to firearms and ammunition;

G.  I have been the case agent during court-authorized interceptions of communications, have applied for and received permission to intercept wire communications, and have experience operating the equipment utilized to conduct such operations;

H.  I know that drug dealers often put telephones in the names of others (nominees) in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

I.  I know that large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

J.  I know that large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

K.  I know that it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are

2

maintained where the traffickers have ready access to them;

L.  I know that it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

M.  I know that it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within their residences, businesses or other locations over which they maintain dominion and control;

N.  I know that large-scale drug traffickers often use electronic equipment such as telephone (land-lines and cellphones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

O.  I know that when drug traffickers amass large proceeds from the sale of drugs, that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

P.  I know that the sale of cocaine, crack, marijuana, and other controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

Q.  I know that it is common for drug traffickers to physically handle and count the "street money" after receiving it in exchange for the drugs thereby leaving residue traces of drugs on the "street money." That law enforcement agencies own dogs which are trained to react to the scent of drugs and residue traces of drugs; and that those trained dogs have reacted to drug-tainted currency negotiated at banks and concealed in drug traffickers' homes;

3

R. I know that it is common for drug traffickers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

S. I know that the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed, may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

T. I know that the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at a financial institution;

U. I know that in order to evade the filing of a CTR, drug traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

V. I know that drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year in which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their homes and businesses;

W. I know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

X. I know that cocaine, crack, and marijuana traffickers commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

Y. I know that drug traffickers take or cause to be taken photographs of themselves; their associates, their property and their drugs. That these traffickers usually maintain these photographs in their possession.

4

Case 2:07-mj-00418-WEC    Filed 07/18/13    Page 5 of 15    Document 1

Z.      I know that a "controlled buy" is a term which refers to a situation in which a confidential informant (herein referred to as CI) works with a law enforcement officer regarding the purchase of a controlled substance from person(s) at a known location; that the law enforcement officer searches the person and clothing of the CI to make sure that the CI has no controlled substances or money; that the law enforcement officer gives the CI money and watches the CI walk to the known location; that the law enforcement officer watches the CI walk out of the location a short time later and return to the law enforcement officer; that the CI gives the law enforcement officer the controlled substance which the CI has purchased inside the location, and relates to the law enforcement officer the circumstances of the purchase; and that the law enforcement officer again searches the CI to make sure that the CI has no controlled substances or money on the CI's person or clothing

2.      This affidavit is based on my personal knowledge, information reported to me by other federal, state, and local law enforcement officers[2] during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gained from interviews with citizen witnesses, informants, and defendants, whose reliability is established separately herein.

3.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4.      This affidavit is submitted in support of applications for search warrants for locations associated with targets believed to be violating Title 21, United States Code, 841(a)(1), 841(b)(1)(A) and 846 (conspiracy to distribute 5 kilograms or more of cocaine and/or 50 grams or more of crack).

---

[2] Throughout this affidavit, reference will be made to case agents. In this affidavit, case agents means those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

5

## II. LOCATIONS FOR WHICH SEARCH WARRANTS ARE SOUGHT

5. I make this affidavit in support of an application for search warrants, for the premises described below in connection with a cocaine trafficking investigation into Terry ROBINSON (hereinafter Robinson) and Dominique ROBINSON (hereinafter Dominique).

    A.    **4673 N. 67th St., Milwaukee, WI** - a one story, single family residence with orange colored brick, green trim, and the numbers " 4673" affixed to the east side of the house east of the front door; and

    B.    **4714 N. 58th St., Milwaukee, WI** - a one story, single family residence with cream colored brick, brown trim, and the numbers " 4714" affixed to the house south of the front door.

6. As detailed below, there is probable cause to believe that located at the above premises are items that constitute evidence of the commission of drug, firearms, and money laundering offenses, including violations of 21 U.S.C. §§ 841 and 846, and 18 U.S.C. §§ 922(g), 924(c), 1956, and 1957. Such items are detailed in Attachment A, Items to be Seized.

## III. CONFIDENTIAL INFORMANTS' CREDIBILITY

7. Throughout this investigation, Affiant has developed several confidential informants (CIs). I believe that the information provided by those informants related to this investigation to be credible and reliable because: (a) each CI has provided specific information to your affiant, which has been corroborated through various investigative means; (b) each CI has provided information that could be used against CI's own penal interest; (c) each CI has obtained information as directed; and (d) each of the CIs has made conducted controlled purchases of drugs for law enforcement.

## IV. SUMMARY OF THE INVESTIGATION

8. On June 26, 2002, DDI-4169 (DDI stands for Dangerous Drug Informant) made a controlled payment of $22,000.00 on past drug debt to Maurice Shelly. Following the controlled

payment, agents surveilled Shelly to the residence located at 4112 N. 45th St., Milwaukee, WI. A short time later, agents observed the same vehicle to depart that residence with two black male occupants. The vehicle's lights were subsequently shut off and the vehicle circled the block and started following surveillance agent, S/A Ray Taylor. At some point, S/A Taylor started driving in reverse and the subject vehicle did the same. S/A Jeff Hale then approached the target vehicle and it sped off. Agents attempted to catch up with the vehicle but were unsuccessful.

9.    On July 7, 2002, case agent S/A Tim Gray had telephonic contact with DDI-4169. The DDI told S/A Gray that the DDI had spoken to Shelly regarding Shelly's encounter with the police on June 26, 2002. Shelly told the DDI that Shelly was at "Terry's" house picking up money. Shelly spotted that he was being followed so Terry rode with Shelly to shoot it out with the person following Shelly.

10.    Agent Gray later interviewed Maurice Shelly. Shelly told Agent Gray that Shelly had identified S/A Taylor but believed he was a rival drug dealer attempting to rob Shelly. Shelly identified Terry Robinson as the second black male in Shelly's vehicle. Shelly had dropped off a female at Robinson's house and Robinson came to the car, at Shelly's request, with two handguns. Shelly and Robinson were attempting to chase down S/A Taylor. When Agent Hale arrived, Shelly and Robinson realized it was the police and sped off. Robinson threw one of the guns out of the car and the other fell under the seat and was not located until later when the vehicle was parked in Robinson's garage. Shelly initially was at Robinson's house to pick up money owed to Shelly by Robinson on past drug debt. Shelly advised affiant that Shelly routinely picked up drug debt owed to Shelly by Robinson from at Robinson's house.

11.    On March 6, 2003, DDI 4169 advised S/A Gray that "Terry" was driving a trap car

7

that formerly belonged to Maurice Shelly. The DDI provided a license plate number of 370EME.

12. On April 17, 2003, during a controlled delivery, DDI 4169 received 4 kilograms of cocaine from Maurice Shelly. Shelly was subsequently placed under arrest. Located in Shelly's vehicle were five additional kilograms of cocaine. Nancy Garza and Guadalupe Menez were riding with Shelly.

13. Shelly advised S/A Gray that the remaining five kilograms of cocaine were to be delivered to Phil Jones. Shelly subsequently made recorded phone calls to Jones confirming the delivery. On April 24, 2003, arrangements were made for Jones to pick up the cocaine and to bring Shelly a quantity of U.S. Currency. Jones was subsequently arrested.

14. On April 23, 2003, Shelly advised S/A Gray that between October 2002 and February 2003, Shelly provided Terry Robinson approximately 10 kilograms of cocaine per month for $19,000.00 per kilogram.

15. On May 1, 2003, Nancy Garza advised S/A Gray that she had observed "Terry" meet Shelly two times in Chicago. Garza has also been present with Shelly on two occasions to deliver one or two kilograms to Robinson in Milwaukee.

16. Near the end of October 2005, S/A Gray learned that Phil Jones was making a trip to Texas. S/A Gray was already aware that Jones made frequent trips to the Dallas, TX vicinity to pick up controlled substances. On November 1, 2005, Jones was arrested while traveling back from Texas. At the time of arrest, Jones was in possession of 4 kilograms of cocaine and approximately 27 pounds of marijuana.

17. On November 29, 2005, CI 4509 informed S/A Gray that CI 4509 has purchased cocaine from Robinson in the past. CI 4509 further advised S/A Gray that on one of CI 4509's trips

8

to Texas, CI 4509 picked up $15,000.00 from Terry Robinson prior to leaving Milwaukee. Robinson later wired $3000.00 more to CI 4509 while CI 4509 was in Texas. A relative of the CI's went to Western Union in Texas to pick up the money. S/A Gray later reviewed Western Union information indicating that Robinson wired $3000.00 that was picked up by the CI's relative on September 10, 2005. Western Union information also indicated that Robinson wired the $3000.00 in the name of Renee Cook (the sister to Dalton Cook who was CI 4509's source of supply for cocaine) on October 6, 2005.

18.     On CI 4509's final trip, CI 4509 received $20,500 from Robinson prior to departing (Robinson owed CI 4509 $3000.00 in addition to the money for one kilogram of cocaine). CI 4509. went to Robinson's house the day prior to traveling to Texas and received the money from Robinson.

19.     CI 4509 believes that Robinson stores his cocaine at Dominique Robinson's house located near N. 67th St. or N. 68th St. and W. Medford Ave. (4673 N. 67th St., Milwaukee, WI)

20.     CI 4509 was also aware that Robinson traded in a Jeep Cherokee that Robinson had received from Maurice Shelly.

21.     On January 26, 2006, Agent Gray conducted an interview of Maurice Shelly regarding Terry Robinson. Shelly informed S/A Gray that Shelly has been providing Robinson with cocaine since the beginning of 2001. After about one month of Robinson increasing his purchase levels, Robinson began receiving 4 to 6 kilograms of cocaine per week from Shelly. For about a one year period, Robinson received 4 to 6 kilograms of cocaine per week from Shelly. Shelly indicated that this level of distribution ended on 06/26/2002. On that day, Shelly went to Robinson's house to pick up $48,000.00. That is the day in which Shelly and Robinson encountered Ray Taylor.

22.     Dealing with Robinson stopped for about one month. After a month, Robinson

9

purchased a Jeep Cherokee from Shelly for $20,000.00. Shelly also gave Robinson a 1996 Camry which had a trap compartment under the back seat. At that point, Robinson started driving to Chicago to pick up the cocaine from Shelly. This went on until Robinson went to jail for dog fighting (01/09/2003). Prior to that, Robinson told Shelly that Phil Jones would be handling Robinson's customers.

23.     On February 10, 2006, Shelly identified a photograph of Terry Robinson.

24.     On April 5, 2006, S/A Gray conducted another interview of CI 4509. CI 4509 indicated that since 2002, CI 4509, Robinson and others have been purchasing cocaine from Maurice Shelly. Beginning in October, 2002 CI 4509 purchased between 2 or 3 ounces and 4 ½ ounces of cocaine from Robinson every 10 days. In January, 2003, Robinson went to prison. Two weeks prior to Robinson going to prison, Robinson provided CI 4509 with ½ kilogram of cocaine and introduced CI 4509 to Maurice Shelly for the purpose of drug trafficking.

25.     On October 20, 2006, S/A Gray conducted an interview of CI-565. CI-565 has been providing Robinson with cocaine since June 2005. Robinson was initially receiving 4 ½ to 9 ounces every 3-4 days. Robinson then started receiving 13 ounces every 3-4 days. This arrangement continued until October 2005. Between June 2005 and October 2005, *mB* CI-565 provided Robinson with approximately 27 ounces of cocaine per week.

26.     On 12/19/2006, CI 4509 made recorded telephonic contact with Terry Robinson. During that conversation, the CI told Robinson that the CI needed a "little bit" (4 ½ ounces cocaine). Terry told the CI that Terry was called into work and that Terry should call Dominique Robinson when he gets off of work at 4:30 p.m.

27.     At approximately 4:59 p.m, Dominique Robinson called the CI.  During that

10

non-recorded conversation, the CI and Dominique confirmed that the CI would come to Dominique's house but that the CI would have to take the money to Terry.

28.     At approximately 5:00 p.m., the CI had recorded telephonic contact with Dominique. During that conversation, Dominique confirmed that the CI should go to Dominique's house and that Dominique would "run in and grab it".

29.     The CI and the CI's vehicle were searched and agent Gray affixed a digital recording device to the CI. The CI was surveilled to 4673 N. 67th St., Milwaukee, WI. where the CI was observed to enter the front door. A short time later, the CI exited the front door and was continuously surveilled to a meet location. At that location, the CI provided to Agent Gray one shoe box, containing one plastic bag, containing approximately 125 grams of suspected cocaine. The CI informed S/A Gray that the CI received that cocaine from Dominique Robinson while inside of 4673 N. 67th St., Milwaukee, WI.

30.     S/A Gray later submitted a sample of the above evidence to a NARK II field test for the presence of Cocaine HCL, obtaining positive results.

31.     S/A Gray then provided the CI with $3000.00 U.S. Currency. The CI was continuously surveilled to Fast Track Auto located at 7515 W. Capital Dr., Milwaukee, WI. where the CI met with and paid Terry Robinson.

32.     On 01/11/2007, surveillance observed Robinson's black Cadillac bearing Wisconsin registration 791KPG to be parked in front of the residence located at 4673 N. 67th St. A subsequent check through Wisconsin Department of Transportation indicates that vehicle listed to Terry Robinson.

33.     S/A Gray subsequently searched the CI, fitted the CI with a digital recording device

11

and surveilled the CI to the residence located at 4673 N. 67th St. The CI was observed to be allowed entry to that residence. A short time later, the CI was observed to depart. The CI was continuously surveilled to a meet location. At the meet location, the CI provided S/A Gray with one clear baggie containing approximately 125 grams of suspected cocaine. The CI indicated that the CI was allowed entry by Dominique Robinson. Terry Robinson provided the CI with the aforementioned cocaine. The CI was able to see at least an additional amount of 4 ½ ounces cocaine to be situated on the kitchen table. The CI indicated that the house smelled of cooking cocaine.

34.     S/A Gray later submitted a sample of the above evidence to a NARK II field test for the presence of Cocaine HCL, obtaining positive results.

35.     Robinson was then observed to arrive at his residence located at 4714 N. 58th St.

36.     S/A Gray subsequently provided the CI with $3000.00 U.S. Currency and continuously surveilled the CI to the residence located at 4714 N. 58th St., Milwaukee, WI. Surveillance agents observed the CI to meet with Robinson in the CI's vehicle in front of the residence located at 4714 N. 58th St., Milwaukee, WI. A short time later, the CI departed and was continuously surveilled to a meet location. The CI advised S/A Gray that the CI gave Robinson $3000.00 while in the truck driven by the CI while parked in front of Robinson's house. Robinson subsequently gave the CI $100.00 back, which the CI turned over to S/A Gray.

37.     Agent Gray conducted criminal history checks on TERRY ROBINSON and DOMINIQUE ROBINSON. The following information was obtained:

a.     TERRY ROBINSON has a prior conviction in Milwaukee County, WI for Possession With Intent to Distribute Cocaine;

b.     TERRY ROBINSON has a prior conviction of Possession of a Firearm by a Felon; and

12

c.     TERRY ROBINSON has prior convictions for Instigation of Animal Fights and Cruelty to Animals.

38.     WE energies records indicate that the residence located at 4673 N. 67th St., Milwaukee, WI is listed to Dominique Robinson since August, 2005. Dominique provided a home phone number of 414-536-1484. ROBINSON tried to call CI 4509 from this number (showed up on caller id.) on 1/11/2007 immediately prior to the CI meeting TERRY and DOMINIQUE ROBINSON at 4673 N. 67th St., Milwaukee, WI.

39.     WE energies records indicate that the residence located at 4714 N. 58th St., Milwaukee, WI is listed in the names of Alicia Brown and Terry Robinson, Jr., since September 2006 with a phone number listed at 414-536-1209. Prior to receiving approximately 125 grams suspected cocaine from TERRY ROBINSON on 01/11/2007, CI 4509 called this number looking for ROBINSON. The CI was told by ROBINSON'S girlfriend that ROBINSON was not at home.

40.     CI's 4509 and 565 both indicate that TERRY ROBINSON breeds pit bulls for fighting and that ROBINSON routinely has pit bulls at residences associated with him.

## V.     CONCLUSION

41.     Based on the facts contained within this affidavit, your affiant believes that TERRY ROBINSON and DOMINIQUE ROBINSON have distributed and continue to distribute kilogram quantities of cocaine and cocaine base in the Eastern District of Wisconsin between June of 2002 and the present date. Your affiant also believes that probable cause exists to believe that located within 4673 N. 67th St., Milwaukee, WI and 4714 N. 58th St., Milwaukee, WI, there is evidence of drug distribution activities between TERRY ROBINSON, DOMINIQUE ROBINSON and others, including pre-recorded Government buy monies, between TERRY ROBINSON, DOMINIQUE ROBINSON and others.

13

## ATTACHMENT A

## ITEMS TO BE SEIZED

1. Controlled substances, including cocaine, cocaine base (in the form of crack cocaine), packaging materials, controlled substances paraphernalia, and other contraband related to drug trafficking and distribution.

2. Proceeds of drug trafficking activities, including United States Currency, financial instruments, jewelry.

3. Books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, and other papers relating to the transportation, ordering, possession, sale, or distribution of controlled substances.

4. Personal telephone books, address books, telephone bills, photographs, videotapes, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities.

5. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the prices, quantity, and/or times when controlled substances were obtained transferred or sold distributed, and/or concealed.

6. Documents and deeds reflecting the purchase or lease of real estate, vehicles, jewelry or other items obtained with the proceeds from organized criminal and drug trafficking activities.

7. Records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones and other communication devices which evidence participation in organized criminal and drug trafficking activities.

8. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents and keys.